**Caton v. JIK Enterprises Inc.**

CP. of Lehigh County, no. 2007-C-0750.

*James T. Huber II,* for plaintiff.
*Kevin T. Fogerty,* for defendants.

VARRICCHIO, J., July 16, 2010—This case involves three individuals: Kathleen C. Caton, plaintiff and Mother; Irene J. Caton, defendant and Daughter; and John Nicnick, defendant and live in partner of Daughter. There are four corporations relevant to this law suit and all were controlled solely by Irene and John. Kathleen was a shareholder in one of the corporations and there has been ongoing litigation since the time when she sought to redeem her shares, eight years ago. The issue in this case is whether Irene and John, in order to avoid paying Kathleen, conveyed away all of the assets of that corporation; after a non-jury trial, this court finds that they did so, intentionally and fraudulently.

All of the parties were involved in the sale of Auntie Anne's pretzels, a franchise business. There were several different business locations, each created at different times and each having a separate corporation. Initially, in 1993 Kathleen invested and became a shareholder in JIK Enterprises; presumably JIK refers to John, Irene, and Kathleen. John, secretary, and Irene, president, were the sole corporate officers, and Kathleen was a non-voting shareholder. This business operated out of Zern's Farmers Market in Gilbertsville, Pennsylvania. Six years after the start of business operations, January 1999, John, Irene, and Kathleen entered into a shareholders' buy/sell agreement (P-19). In part, the agreement established that the price for the company's purchase of shares shall be equal to the greater of $50,000 or 2/3 of the prior fiscal year's gross sales.

It appears from the record that sometime between 1993 and 1999 profits began to shift from JIK to Sassafras Management Inc., the fourth corporation. Sassafras, designed and controlled by Irene and John, increased JIK costs and reduced JIK profits in that JIK employees, formerly paid by JIK, were hired, employed and paid by Sassafras. On paper, the purpose of Sassafras was to reduce overall operating costs through the centralized administration of accounting and payroll for JIK, and the two other pretzel business operations, CM Enterprises Inc. and ETN Enterprises Inc. Instead of three separate payrolls from the three corporations, all of the payrolls were paid from Sassafras. Sassafras would bill JIK, CM, and ETN a management fee at a rate of 125 percent of the payroll. This rerouting of JIK payroll thru Sassafras reduced the profits available to Kathleen and increased those to Irene and John.

In June 2001, Kathleen gave written notice to Irene and John that she wished to redeem her shares pursuant to the agreement. The parties were unable to agree upon a buy out; Mother brought legal action in January 2002 against daughter and her partner.[1] Kathleen's complaint was filed individually and on behalf of JIK, derivatively, against John and Irene, individually, and J1K (P, 19). She alleged, among other things, that John and Irene breached the buy/sell agreement as well as their fiduciary duties by reducing the profits of JIK to the benefit of their other corporations via excessive management fees. Two and one-half years later, and less than a month from trial, the litigation settled in June 2004. A settlement agreement, release, and promissory note was executed

---

1. Lehigh County Court of Common Pleas, 2002-E-5, filed January 2002.

by the parties (P, 1). By its terms, JIK was to pay Kathleen $50,000; $5,000 down and $747.05 monthly for 84 months with 10 percent interest per annum beginning July 1, 2004. The debt was secured with a promissory note.

In the meantime, unbeknownst to Kathleen, 45 days prior to the settlement of the litigation with Kathleen, John and Irene had executed a security agreement on April 19, 2004 in the amount of $200,000 and a judgment note in the amount of $86,008.71 in favor of Sassafras and against JIK (D, 1-3). The UCC filing financing statement was filed April 26, 2004. Irene in her candid deposition testimony of September 25, 2007 stated that the purpose of the security agreement and of the note was to get Sassafras ahead of Kathleen. She agreed that its purpose was to ensure that Sassafras would get the money from JIK before Kathleen would get money from JIK. Her less than credible testimony at trial attempted to downplay her admission; she explained that she had other pressing matters, like unpaid taxes. Irene's true colors were revealed on the checks that she sent pursuant to the settlement agreement in June and in August of 2004 to her mother. On the first check, Irene drew a shark (which Irene testified was simply a fish) and on the third check she drew a cockroach which took up half of the face of the check (P, 3 and 4).

The parties continued to battle in court. This time Daughter and her partner sued Mother; September 2004, Irene and John sued Kathleen for $31,000, the legal fees that they individually incurred defending the litigation initiated by Mother (P, 10).[2] The case went to arbitration

2. Lehigh County Court of Common Pleas, 2004-C-2528, filed September 2004.

seven months later in April 2005; judgment was entered in favor of Kathleen. No appeal was taken. These legal fees of Irene and John, individually, were ultimately paid by JIK.[3]

Payments to Mother pursuant to the settlement agreement continued to be made until Irene and John sold JIK; August 24, 2006, JIK was sold for $85,000 to 14M LLC rendering JIK insolvent. At the time of the asset sale, after payment of approximately $14,000 of attorney fees and the subsequent transfer of the proceeds to Sassafras, JIK remained indebted to Kathleen in the amount of $34,248.45. None of the proceeds from the asset sale were utilized to repay the JIK corporate debt to Kathleen. However, Irene and John did choose to pay their own attorney fees out of the sale of JIK.

There were disbursements made at the settlement that indicate that despite the UCC filing, Irene and John decided what debts would be paid from the sale of JIK. The settlement statement for the sale of JIK included disbursements in the amount of $3,911.85 paid to Tallman, Rudders, & Sorrentino P.C. on behalf of JIK for attorney fees owed for JIK/Zern's and JIK litigation. Irene clarified that some of these attorney fees were those owed individually by her and John for their defense in the litigation brought by Kathleen (P, 5). She testified that she took the money to pay JIK attorney fees.

After the payment of approximately $14,000 in attorney fees, the funds received by JIK, including a promissory note, were transferred by JIK to Sassafras

---

3. JIK, Irene and John incurred approximately $70,000 in legal fees and costs.

(P. 8). There was a purchase money note on the sale given by 14M LLC, which was payable to JIK. Because of the UCC filing by Sassafras, Sassafras, that is, Irene and John, were paid first, and there was no money left over for Kathleen.

As per the judgment note and customer balance detail, JIK owed Sassafras $86,008.71 (D, 11). The customer balance detail is dated October 3, 2007; the report begins on January 4, 2002 with a balance owed by JIK to Sassafras in the amount of $33,674.73. The report concludes on April 25, 2007 with a balance owed to Sassafras of $124,229.44. The report references invoices and payments made by JIK to Sassafras; however there is nothing in this document that denotes the nature of the invoice and/or payment; the court found this report to be nothing more than a self-serving report of the defendants as it is uncorroborated by any other document. Furthermore, there is nothing in the JIK or Sassafras tax returns or balance sheets that identifies the $86,008.71 judgment note or debt.[4]

After the judgment note was executed by Irene and John as JIK to Irene and John as Sassafras, JIK paid to Sassafras the sum of $69,250 from April 24, 2004 to August 24, 2006. However, contrary to prior Sassafras bookkeeping practices, John and Irene failed to apply these monies paid by JIK to the oldest open invoices owed to Sassafras. John and Irene were the sole decision makers, they chose where to apply the money transferred from JIK to Sassafras. Kathleen was not the only one

4. JIK financial records were kept on a cash basis and records of Sassafras were on the accruel basis.

that they were over looking when it came to paying bills. Taxes were being withheld from JIK employee paychecks, however, Irene and John acting through Sassafras never sent the money to the IRS and as such there was a continually growing tax lien.

JIK and Sassafras were under the exclusive control of both Irene and John, such that it can be inferred that action taken by any entity individually was necessarily known by the others. Irene and John jointly controlled and dominated the corporate finances, policies, and business practices of both JIK and Sassafras. Specifically, Irene and John were the sole corporate officers of JIK and Sassafras, and were the controlling force in both corporations. Although Irene and John attempted to use the corporate structures as a shield, the patterns of their behaviors and Irene's own statements suggest that Irene and John were the masterminds pulling the puppet strings such that the corporate and individual actions were one and the same. Additionally, personal expenses, such as Irene and John's individual attorney fees, were satisfied by the corporate structures further solidifying the notion that JIK and Sassafras were in actuality Irene and John. Furthermore, where a corporate structure exists to benefit private concerns and it is not financially stable and successful on its own, as is the case here, then it is property viewed as an extension of the individuals hiding behind it such that it has become an alter ego for purposes of piercing the corporate veil.[5] However, piercing the corporate veil is not addressed in the complaint and as such, this court will not address it any further.

---

5. Blatstein v. Blatstein, 192 F.3d 88 (3d.Cir. 1999).

Counts I and II of the Complaint allege violations of the Pennsylvania Uniform Fraudulent Transfer Act,[6] by JIK and Sassafras, respectively. Specifically, Kathleen argues that the transfer of JIK funds to Sassafras was a fraudulent transfer in violation of Pennsylvania law. To recover on a fraudulent transfer action, the plaintiff must plead and prove by clear and convincing evidence that a transfer was made with actual intent to hinder, delay or defraud any creditor.[7] Relevant factors to be taken into consideration include whether the transfer was made to an insider and whether the debtor retained possession or control of the assets.

Here, because JIK and Sassafras were exclusively controlled by Irene and John, any action by either Irene or John individually was properly attributed to the corporate structure such that it can be inferred that any asset transfer was self-serving. Irene and John controlled and dominated the corporate finances, policies, and business practices. It was clear that Irene resented the fact that JIK was making monthly payments to her mother, Kathleen, as evidenced by her testimony in court, her deposition testimony, and her actions in manipulating profits from Kathleen.

The court concludes that the transfer of the JIK sale proceeds to Sassafras was done with the intent to defraud Kathleen. Sassafras was in fact a secured creditor and as such, stood in line ahead of Kathleen in the payment of JIK debts. JIK sold all of its assets and rather than transfer all of the proceeds to the secured creditor, Sassafras, JIK chose to pay some of its unsecured creditors, spe-

---

6. 12 Pa.C.S. §§5101 et seq. adopted in 1993.
7. 12 Pa.C.S. §5104(a)(1).

cifically attorney fees, leaving no proceeds available to pay Kathleen pursuant to the settlement agreement. Additionally, the settlement reveals how the transfer was made to an insider, as JIK and Sassafras were exclusively controlled by Irene and John. JIK bent the rules when attorney fees were paid at settlement, evidencing that JIK, despite the legal claim that Sassafras had over the proceeds, paid its own bills first, further proving that JIK, Irene and John retained control over the property. It is undisputed that the individual attorney fees of Irene and John were paid from the proceeds of the sale of JIK. ·Irene argued that she was required to do so by her attorneys, but ultimately under cross-examination she admitted that she was the one in charge who made the final decision.

It is unclear whether JIK paid the attorney fees or the money went to Sassafras first and then Sassafras paid the fees, but in any event the secured debt of Sassafras was not paid first as portrayed and that makes clear the nature of the transactions. Because JIK and Sassafras were virtually an extension of Irene and John, the individuals, the asset transfer was to an insider. The same two individuals controlled both corporations so that although it appeared that the assets shifted from one corporation to another, in actuality the assets remained under the control of Irene and John. Also, Irene and John retained possession and control of the assets by virtue of that transfer. Furthermore, Irene disclosed that she did not want to pay her mother and the intent of the security agreement was to put Sassafras ahead of Kathleen. Therefore, the corporate defendants, JIK and Sassafras acted with the intent to defraud Kathleen and thus violated the Pennsylvania Uniform Fraudulent Transfer Act.

This court finds that Sassafras and its sole shareholders and officers, namely Irene and John, are liable to pay the debt owed to Kathleen. Although Sassafras was not bound by the contract between JIK and Kathleen creating the debt, Sassafras and its officers are liable to this third party. This liability is created by virtue of the multiple indications of fraud between JIK, Sassafras, and their shareholders. As this court has found clear and convincing evidence of actual fraud, Kathleen's alternative argument that defendants engaged in constructive fraud is not addressed by this court.

Counts III and V of the complaint, breach of fiduciary duty, contain allegations whereby Kathleen asserts that Irene and John, respectively, breached their duty by transferring funds from JIK to Sassafras that reduced JIK to insolvency. To recover on a breach of fiduciary duty action, the plaintiff must plead and prove that there was: (1) a duty owed; (2) a breach of that duty in the form of exercising his power for his own benefit and to the detriment of the company/creditors/stockholders (it could be self-dealing, willful misconduct or recklessness); and (3) damages in the form of lost profits as a consequence of the breach.[8]

Here, Irene and John necessarily owed a duty to be loyal and look out for the best interests of JIK and Sassafras because they were the sole officers and directors of both corporations. Arguably they breached that duty when JIK no longer retained control of its own payroll and began paying Sassafras a management fee of 125 percent to manage the payroll, which resulted in Sassafras not paying the IRS the taxes that were being withheld

8. Pa.C.S. §§512 and 513.

from the employee paychecks. Sassafras failed to pay employment related taxes beginning in 1999 through 2003. This continued failure to pay taxes resulted in tax liens filed against Sassafras in December 2003 and January 2004 of $98,293.36 and $17,507.46, respectively.

Defendants cleverly argue that JIK's solvency status did not change as a result of the asset transfer. Arguably, JIK was already insolvent by definition because its debts were greater than its assets.[9] However, the fact remains that JIK was rendered insolvent regardless if it was prior to or as a result of the transfer. Because Irene and John had total control of both JIK and Sassafras, they were responsible for JIK's insolvency status regardless of when it occurred. Both Irene and John owed a fiduciary duty to JIK and it is the breach of that duty that resulted in JIK becoming insolvent, whether as a result of the asset transfer to Sassafras or prior patterns of behavior of purposefully increasing JIK debts.

When a company becomes insolvent like JIK did as a result of the asset transfer, the fiduciary duties owed by the corporate directors shift to the creditors.[10] Here, the duty did not shift because Irene and John were the directors and creditors of JIK. Furthermore, Irene and John as the shareholders of JIK and Sassafras also owed fiduciary duties to both companies. The fact that Irene and John controlled both companies, any transfer of assets necessarily unjustly enriched them. Thus, Irene and John breached their fiduciary duties to JIK and Sassafras by

---

9. 12 Pa.C.S. §5102(a).

10. *Voest-Alpine Trading USA v. Vantage Steel Corp.,* 919 F.2d 206 (3d Cir. 1990).

increasing JIK's debt, being the actors in the asset transfer and having their own personal attorney debts satisfied with corporate funds, as well as applying the funds to the invoices of their choosing rather than apply the proceeds to the oldest invoices first.

Counts IV and VI of the complaint allege that Irene and John, respectively, conspired with each other to transfer JIK funds to Sassafras with the purpose of depriving Kathleen of the money legitimately owed to her by JIK. To recover on a civil conspiracy action, the plaintiff must plead and prove that "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage." [11]

Here, Irene and John were the sole actors behind the ongoing diversion of profits to Kathleen and ultimately the asset transfer from JIK to Sassafras. As directors and shareholders of both corporations, they both knew the effect the transfer would have on the corporations and on Kathleen. It is clear to this court that Irene and John purposely acted to prevent Kathleen from receiving the remainder of the monthly payments agreed to in the 2004 settlement agreement, such that they committed a civil conspiracy.

Irene's testimony and the settlement sheet of the JIK asset transfer reveal several relevant factors. First, the corporations and Irene and John intermingled corporate and personal affairs. Specifically, the settlement sheet indicates disbursement made on behalf of JIK of

___

11. *Phillips v. Selig,* 959 A.2d 420 (Pa. Super. 2008).

$14,990.21; all of which were unsecured JIK debts. A portion of these disbursements were for payments for legal fees itemized as JIK/Zern's and JIK Litigation. These legal fees included JIK and individual attorney fees from the 2002 litigation, although they did not have priority over the secured Sassafras debt they were paid first, further demonstrating that Irene and John manipulated the finances for their own benefit.

Second, Irene, as president of JIK and Sassafras, circumvented corporate formalities when she commingled JIK assets and utilized them with total disregard for the corporations' separate existence and for the sole benefit of Irene and John. Another portion of the disbursements made on behalf of JIK were for tax related attorney fees itemized as Tax Matter — Sassafras. It is unclear why JIK closing costs would include an unsecured debt of Sassafras, other than to confirm that JIK and Sassafras were one and the same because the same individuals controlled both and the funds were commingled. Irene determined the priority of the debts listed as JIK's closing costs for the benefit of Irene, John and Sassafras, in disregard of the corporations' separate existences.

Also, Irene and John had total control of JIK and Sassafras such that they were able to render JIK insolvent, consistent with their intent to avoid paying Kathleen's debt. The judgment amount and the lack of any documents to corroborate the JIK debt substantiates their intention. The debt continued to grow even though the evidence submitted by Sassafras failed to establish the nature of the charges to JIK and any credit for payments made after the debt was secured. JIK payments received by Sassafras after the creation of the secured interest were not credited toward that debt contrary to the prior

practice between the corporations of applying JIK payments to the oldest outstanding invoices. In fact, JIK had paid Sassafras $69,250, reducing the amount of the judgment far below the proceeds transferred to Sassafras. Had JIK been properly credited for its payments, JIK could have satisfied its debt to Sassafras and Kathleen from the proceeds. Again, this is demonstrative of the control by Irene and John individually and as Sassafras and JIK to render JIK insolvent and unable to satisfy Kathleen's lien.

Given the stated intent, the credibility observed at trial, the total control of the corporations by the two officers and the pattern of debt payments by the corporations to the benefit of Irene and John, and the commingling of personal and corporate affairs, this court cannot permit the corporations to protect the fraud and must find Irene and John liable.

For the reasons stated, the court finds in favor of plaintiff, Kathleen C. Caton, and against defendants, JIK Enterprises Inc. and Sassafras Management Inc., on Count I and II for fraudulent conveyance in the amount of $34,248.45 plus 10 percent interest until paid in full. A constructive trust shall be placed on all of the assets of defendant, Sassafras Management Inc., and no assets may be sold, conveyed, or transferred until the debt owed to plaintiff, Kathleen C. Caton, is paid in full.

The court finds in favor of plaintiff, Kathleen C. Caton, and against defendants, Irene J. Caton and John Nicnick, on Counts III, IV, V and III for breach of fiduciary duty and civil conspiracy in the amount of $34,248.45 plus 10 percent interest until paid in full, and as punitive damages, attorney fees as well as 10 percent interest on the

$34,248.45 debt from September 15, 2006 to the date of this order. A constructive trust shall be placed on all of the assets of defendant, Irene J. Caton and John Nicnick, and no assets may be sold, conveyed, or transferred until the debt owed to plaintiff, Kathleen C. Caton, is paid in full.

## ORDER

And now, July 16, 2009, following a non-jury trial held on November 24, 2008 for the reasons set forth in the attached opinion;

It is hereby ordered that:

(1) Judgment is entered in favor of plaintiff, Kathleen C. Caton, and against defendants, JIK Enterprises Inc. and Sassafras Management Inc., on Count I and II for fraudulent conveyance in the amount of $34,248.45 plus 10 percent interest until paid in full.

(2) A constructive trust shall be placed on all of the assets of defendants, Sassafras Management Inc., Irene J. Caton and John Nicnick, and no assets may be sold, conveyed, or transferred until the debt owed to plaintiff Kathleen C. Caton, is paid in full.

(3) Judgment is entered in favor of plaintiff, Kathleen C. Caton, and against defendants, Irene J. Caton and John Nicnick, on Counts III, IV, V and VI for breach of fiduciary duty and civil conspiracy in the amount of $34,248.45 plus 10 percent interest until paid in full, and as punitive damages, attorney fees as well as 10 percent interest on the $34,248.45 debt from September 15, 2006 to the date of this order.